FILED
United States Court of Appeals
Tenth Circuit

May 21, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

WENDY MARIE YUREK,

    Defendant-Appellant.

No. 18-1134

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CR-00394-WJM-2)**
_____

Robert S. Jackson, Oklahoma City, Oklahoma, for Defendant-Appellant.

Pegeen D. Rhyne, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **BACHARACH**, **BALDOCK**, and **EBEL**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

Mrs. Wendy Yurek and her husband, Mr. Daryl Yurek, were charged with tax evasion and bankruptcy fraud.[1] After a joint jury trial, Mrs. Yurek and her husband were convicted on both offenses. The district court then sentenced Mrs. Yurek to a prison term of 27 months, leading her to appeal the conviction and sentence.

We affirm in part and reverse in part. We affirm Mrs. Yurek's conviction, but we vacate the sentence because the district court applied the wrong test when deciding whether to grant a mitigating-role adjustment.

## I. We reject Mrs. Yurek's challenges to the sufficiency of the evidence on her conviction for tax evasion and bankruptcy fraud.

We conclude that the evidence of Mrs. Yurek's guilt was sufficient to support her conviction for tax evasion and bankruptcy fraud.

### A. We engage in de novo review over the sufficiency of the evidence.

In considering the sufficiency of the evidence, we engage in de novo review. *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010). We will reverse only if no rational factfinder could have found that the government had proven all of the elements of an offense beyond a

---

[1] Mr. Yurek was also charged with making a false statement under oath in a bankruptcy proceeding and willfully making false statements to the IRS under penalty of perjury.

reasonable doubt. *United States v. Brown*, 400 F.3d 1242, 1247 (10th Cir. 2005).

Under de novo review, we view the trial evidence in the light most favorable to the government. *United States v. Boisseau*, 841 F.3d 1122, 1125 (10th Cir. 2016). We do not reevaluate witness credibility or reweigh the evidence. *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997).

**B.      The evidence was sufficient to convict on tax evasion.**

Mrs. Yurek was convicted of tax evasion, which consists of "willfully attempt[ing] in any manner to evade or defeat any tax imposed by [the Internal Revenue Code] or the payment thereof." 26 U.S.C. § 7201. To obtain a conviction on this offense, the government had to prove three elements:

1.      Mrs. Yurek owed a substantial tax to the IRS.

2.      Mrs. Yurek committed "an affirmative act constituting an evasion or attempted evasion" of assessment or payment of the tax.

3.      Mrs. Yurek willfully evaded or attempted to evade the assessment or payment of the tax.[2]

*United States v. Boisseau*, 841 F.3d 1122, 1125 (10th Cir. 2016) (citing *Sansone v. United States*, 380 U.S. 343, 351 (1965)); *see United States v.*

---

[2]      Mrs. Yurek argues that the government did not establish that she and her husband had the ability to pay their IRS tax debt. But the ability to pay one's taxes is not an element of tax evasion. *See Boisseau*, 841 F.3d at 1125.

*Thompson*, 518 F.3d 832, 850 (10th Cir. 2008) (noting that the tax liability must be "substantial").

Mrs. Yurek challenges the sufficiency of the evidence on the second and third elements (an affirmative act and willfulness).

### 1. The evidence was sufficient to find an affirmative act.

To establish an affirmative act, the government had to prove an act designed to "mislead or conceal" within the six-year period of limitations. *United States v. Thompson*, 518 F.3d 832, 852 (10th Cir. 2008); *see United States v. Anderson*, 319 F.3d 1218, 1219 (10th Cir. 2003) (holding that when a defendant commits a series of affirmative acts over multiple years, the six-year period of limitations for tax evasion begins with the last affirmative act). The government bore the burden to prove that Mrs. Yurek had committed at least one affirmative act. *United States v. Hoskins*, 654 F.3d 1086, 1091 (10th Cir. 2011). The jury could have reasonably found that the government had satisfied this burden.

### a. "Affirmative acts" are broadly defined.

We first consider what constitutes an affirmative act. Federal law suggests an expansive definition, stating that tax evasion can be committed by evading taxes "in any manner." 26 U.S.C. § 7201; *see Boisseau*, 841 F.3d at 1125 ("[T]he type of affirmative conduct that can constitute an affirmative act of evasion is broad."). Affirmative acts thus include

- concealing assets,

4

- covering up sources of income, and

- engaging in misleading or concealing conduct.

*Boisseau*, 841 F.3d at 1125. Affirmative acts may even consist of otherwise lawful conduct if the acts are committed with an intent to evade taxes. *Id.*; *United States v. Gorrell*, No. 18-5041, 2019 WL 1890971 at *5 (10th Cir. Apr. 29, 2019).

**b.    The evidence sufficed for a finding that Mrs. Yurek had committed an affirmative act.**

Viewed in the light most favorable to the government, the trial evidence allowed a reasonable jury to find affirmative acts involving (1) payment of personal expenses from business accounts and (2) submission of false tax documents to the IRS.

**i.    The jury could have reasonably found that Mrs. Yurek had committed affirmative acts by paying her and her husband's personal expenses out of business accounts.**

Mrs. Yurek had authority to write checks on behalf of Bolder Venture Partners and Veracity Credit Consultants, LLC, and she used that authority to write business checks for her and her husband's personal expenses. A fact-finder could have reasonably viewed the writing of these checks as affirmative acts to evade taxes.

Some of these checks came from Bolder Venture Partners, where Mrs. Yurek was a partner. For example, Mrs. Yurek signed a $2,309.68

5

check from Bolder[3] to pay condominium-association dues for the loft where she and her husband lived.

Mrs. Yurek contends that her son, Mr. Justin Yurek, owned the loft. But the trial evidence was sufficient to support findings that (1) Justin had been a "straw purchaser" and (2) Mrs. Yurek and her husband were the true owners of the loft. *See United States v. Reese*, 745 F.3d 1075, 1078 (10th Cir. 2014) (explaining a straw purchase).

Mrs. Yurek and her husband had been leasing the loft and living in it. They had a contract to purchase the loft, but a tax lien prevented them from obtaining a mortgage. So they assigned the contract to Justin, who purchased the loft. Though Justin was the purchaser, Mrs. Yurek's husband negotiated the sale and used companies (over which he wielded significant control) to fund more than $112,000 of the down payment.

After Justin purchased the loft, Mrs. Yurek signed an affidavit on Justin's behalf, stating under oath that (1) the loft would serve as Justin's primary residence and (2) Justin had no intent to lease the loft or to make the purchase as an investment.[4] But Justin never lived in the loft, and Mrs.

---

[3]    Mrs. Yurek wrote the check for $2,309.68 within the six-year limitations period.

[4]    Despite the affidavit, Justin testified that he had bought the loft as an investment.

Yurek and her husband continued to live there while making only infrequent rental payments.

Mrs. Yurek not only used her role at Bolder to pay condominium-association dues but also used her check-writing authority at Veracity Credit Consultants, LLC to pay her husband's country-club dues and expenses. For example, she signed a Veracity check for $3,403.43 to pay these expenses.[5]

Veracity also paid other expenses for Mrs. Yurek and her husband. For example, Veracity paid the rent on two homes that Mrs. Yurek and her husband used. Veracity's former chief financial officer, Mr. Michael Hennigan, testified that he knew of no business purpose for these rentals or the country-club dues and expenses.

Veracity also made mortgage payments on the loft where Mrs. Yurek and her husband lived. The jury could reasonably infer that the Yureks were trying to hide the source of these mortgage payments. For example, they recorded the mortgage payments under an account designated as a loan account for Mrs. Yurek's husband, but Veracity did little to collect on the purported loan.

Bolder and Veracity paid these various personal expenses for Mrs. Yurek and her husband while they

- owed substantial taxes and penalties to the IRS and

---

[5]     This check was signed within the six-year period of limitations.

- tried to settle with the IRS based on their inability to pay what they owed.

These payments continued through the bankruptcy proceedings, where Mrs. Yurek and her husband tried to discharge their federal tax debt. But Mrs. Yurek and her husband did not tell the IRS about these payments.

Given this combination of evidence, the jury could have reasonably found that Mrs. Yurek had committed an affirmative act to evade the payment of taxes. *See United States v. Farr*, 701 F.3d 1274, 1285–86 (10th Cir. 2012) (concluding that the defendant's use of a corporate account to pay for personal living expenses supported a factual finding that the defendant had "willfully evaded [a tax penalty] and [had taken] affirmative steps to do so").

### ii. A reasonable jury could also have found that Mrs. Yurek had committed affirmative acts by submitting false tax documents to the IRS.

Along with her husband, Mrs. Yurek submitted tax forms to the IRS in 2009 and 2010. On these forms, Mrs. Yurek and her husband reported that their gross monthly income was $7,667. But this amount didn't include Bolder and Veracity's payments for personal expenses. The jury could reasonably have viewed these omissions as misleading or even false.

8

Mrs. Yurek's submission of misleading or false tax documents to the IRS could constitute affirmative acts.[6] *See Sansone v. United States*, 380 U.S. 343, 351–52 (1965) ("[I]t is undisputed that petitioner filed a tax return and that the petitioner's filing of a false tax return constituted a sufficient affirmative commission to satisfy that requirement of § 7201."); *United States v. Hoskins*, 654 F.3d 1086, 1091 (10th Cir. 2011) (concluding that submission of a false tax return "was sufficient to establish an affirmative act under § 7201").

### 2. The evidence was sufficient to find that Mrs. Yurek had acted willfully.

To satisfy the willfulness requirement, the government had to prove a specific intent to evade taxes. *United States v. Payne*, 978 F.2d 1177, 1182 (10th Cir. 1992); *see Hoskins*, 654 F.3d at 1090 ("Under § 7201, 'willfulness' means the 'voluntary, intentional violation of a known legal duty.'" (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991))).

The government can ordinarily establish the willfulness requirement through "circumstantial evidence or inferences arising from a defendant's conduct." *United States v. Boisseau*, 841 F.3d 1122, 1127 (10th Cir. 2016). The willfulness requirement is "closely connected" to the affirmative-act

---

[6] The government also argues that Mrs. Yurek's filing of the bankruptcy petition constituted an affirmative act. We need not address this argument.

requirement, for "'[e]vidence of affirmative acts may be used to show willfulness.'" *Id.* (quoting *United States v. Romano*, 938 F.2d 1569, 1572 (2d Cir. 1991)) (alteration in original).

Viewed in the light most favorable to the government, the trial evidence was sufficient in five ways to prove Mrs. Yurek's specific intent to evade taxes.

First, a reasonable jury could have found that Mrs. Yurek had known of her legal obligation to pay her federal tax debt. With this finding, the jury could reasonably have concluded that Mrs. Yurek had committed the affirmative acts with an intent to evade payment of her tax debt.

Second, Mrs. Yurek represented to the IRS that she and her husband couldn't pay more than $75,000 of their tax liability based on "insufficient assets and income" even though they had just signed a contract to pay $1.3 million for a loft. Supp. R., vol. 1, at 125, 185. Given the timing of Mrs. Yurek's representation to the IRS and the contract to purchase the loft, a jury could rationally have found a specific intent to evade the tax debt.

Third, the jury could reasonably have found that Mrs. Yurek had arranged for Justin to purchase the loft in order to conceal her financial interest in it. *See* pp. 6–7, above.

Fourth, Mrs. Yurek reported to the IRS that she and her husband had a gross monthly income of $7,667 in 2009 and 2010, but Bolder and

10

Veracity paid monthly payments of more than $7,667 for the Yureks' personal expenses.

Fifth, Mrs. Yurek told Veracity's accountant that her husband would repay his loan account every year. He didn't, so a jury could reasonably have found that (1) Mrs. Yurek was misleading the accountant about her husband's intent to repay the loans and (2) the loan account served as a sham to deceive the IRS.

The jury thus could reasonably have found that Mrs. Yurek had a specific intent to evade the payment of tax debt, and this finding would satisfy the requirement of willfulness. *See United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (observing that willfulness can be inferred from "concealment of assets or covering up sources of income" (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943))).

Despite this evidence, Mrs. Yurek argues that she lacked expertise in tax matters and depended on professionals. But the jury could reasonably have discounted this argument and found that Mrs. Yurek had known that she was giving false information to the IRS. For example, the jury could have reasonably relied on Mrs. Yurek's accounting experience, which included handling Veracity's payroll and accounts payable and helping to prepare Bolder's tax returns in 2005, 2006, and 2007. *See United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (treating evidence of a defendant's accounting experience as support for a finding of willfulness).

11

For these reasons, we reject Mrs. Yurek's challenge to the sufficiency of the evidence for her conviction on tax evasion.[7]

### C. The evidence was sufficient to convict Mrs. Yurek of bankruptcy fraud.

Mrs. Yurek was also convicted of bankruptcy fraud. This crime involves filing a bankruptcy petition with an intent to execute, conceal, or attempt to execute or conceal "a scheme or artifice to defraud." 18 U.S.C. § 157(1). To obtain a conviction on this offense, the government had to prove three elements beyond a reasonable doubt:

1. Mrs. Yurek had devised or intended to devise a scheme to defraud or otherwise engage in a fraudulent scheme.

2. Mrs. Yurek had filed a bankruptcy petition with the purpose to execute or conceal the scheme or attempt to do so.

3. Mrs. Yurek had acted with the specific intent to defraud.[8]

---

[7] Mrs. Yurek argues that her conviction cannot stand because the government didn't present expert testimony on "technical concepts such as income or assets." Appellant's Op. Br. at 15. We disagree and conclude that expert testimony was not necessary to assist the jury in understanding the evidence.

[8] In its jury instructions on the first and third elements, the district court referred to our circuit's pattern jury instruction for mail fraud under 18 U.S.C. § 1341:

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension and includes a scheme to deprive another of money or property. An "intent to defraud" means an intent to deceive or cheat someone.

*See United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011) (listing the elements that the government must prove under § 157(1) as "(1) a specific intent to defraud; (2) a scheme to defraud; and (3) filing a bankruptcy petition to conceal or execute that scheme"). Mrs. Yurek argues that the trial evidence was insufficient on the elements of bankruptcy fraud.[9] We disagree.

Viewed in the light most favorable to the government, the trial evidence was sufficient for a jury to reasonably find satisfaction of each element. That evidence showed six pertinent facts:

1.   Mrs. Yurek and her husband had owed a substantial tax debt to the IRS.

2.   Mrs. Yurek and her husband had filed a bankruptcy petition in order to discharge that debt.

3.   When filing the bankruptcy petition, Mrs. Yurek and her husband had not told the court that Bolder and Veracity were paying the Yureks' personal expenses.

---

R., vol. 2, at 121–22 (citing 10th Cir. Pattern Crim. Jury Instr. § 2.56 (mail fraud)). As the district court noted, courts have used § 1341 for guidance when interpreting 18 U.S.C. § 157(1). *See United States v. Milwitt*, 475 F.3d 1150, 1155 n.5 (9th Cir. 2007) ("Most of the few courts that have interpreted 18 U.S.C. § 157 have looked to 18 U.S.C. §§ 1341 and 1343 for guidance.").

[9]   Mrs. Yurek also relies on the fact that the IRS and the bankruptcy trustee didn't object to discharge of the Yureks' tax debt. According to Mrs. Yurek, the absence of an objection shows that the government did not prove the elements of bankruptcy fraud. We disagree. The absence of an objection could conceivably affect the weight of the evidence but not its sufficiency to convict.

4. Bolder and Veracity had continued to pay the Yureks' personal expenses during the bankruptcy proceedings, but Mrs. Yurek and her husband never told the bankruptcy court about these payments.

5. Mrs. Yurek had been a partner at Bolder and was responsible for Veracity's accounts payable and payroll.

6. Mrs. Yurek had participated in obtaining the checks from Bolder and Veracity for personal expenses.

Given the evidence of these six facts, we conclude that the jury could reasonably have found all of the elements of bankruptcy fraud.

## II. We reject Mrs. Yurek's challenges to the district court's denials of her motions for severance and a new trial.

We also reject Mrs. Yurek's arguments that the district court should have (1) severed her trial from her husband's or (2) granted her a new trial.

### A. The district court generally enjoyed discretion on these matters.

On these issues, we apply the abuse-of-discretion standard. *See United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009) (severance); *United States v. Patterson*, 41 F.3d 577, 579–80 (10th Cir. 1994) (new trial). On the refusal to sever the trial, Mrs. Yurek needed to show actual prejudice. *See United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986) ("To establish that a court abused its discretion, a defendant must show actual prejudice to him resulting from a denial of his request for severance.").

14

To satisfy this burden, Mrs. Yurek needed to show a "serious risk" that joinder would compromise a specific trial right or prevent a reliable determination of guilt. *Pursley*, 577 F.3d at 1215. Mrs. Yurek argues both, asserting that joinder

- created prejudice through a spillover effect from the evidence of her husband's guilt and

- violated the Sixth Amendment and created further prejudice by preventing her from confronting her husband about his out-of-court statement in bankruptcy court.[10]

In our review of her Sixth Amendment theory, we engage in de novo review. *United States v. Clark*, 717 F.3d 790, 813 (10th Cir. 2013).

**B.    Mrs. Yurek has not shown actual prejudice from introduction of the evidence against her husband.**

Mrs. Yurek contends that her trial should have been severed from her husband's because

- the evidence against her was slim in comparison to the evidence against her husband and

- the jury could not have followed the district court's instruction to separately consider the evidence against her and her husband.

---

[10]    In a footnote, Mrs. Yurek also suggests that the government violated Federal Rule of Evidence 403 by using her husband's out-of-court statement against her. Mrs. Yurek's passing reference to Rule 403 does not constitute adequate briefing of a distinct issue. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."); *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1219 n.4 (10th Cir. 2016) (concluding that "passing references" to an issue do not constitute adequate briefing).

15

We conclude that the district court acted within its discretion by rejecting these arguments.

Federal courts generally prefer to jointly try defendants who were indicted together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). This preference is based on recognition that

- joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts"[11] and

- joint trials are ordinarily more efficient in cases where the evidence against multiple defendants is "overlapping and intertwined."[12]

Mrs. Yurek tries to skirt this preference based on the alleged spillover of evidence against her husband. But severance is not warranted by "a mere allegation that defendant would have a better chance of acquittal in a separate trial" or "a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party." *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986); *see United States v. Wardell*, 591 F.3d 1279, 1300 (10th Cir. 2009) ("[T]he nearly insuperable rule in this circuit is that a defendant cannot obtain severance simply by showing that the

---

[11]    *Zafiro*, 506 U.S. at 537 (internal quotation marks omitted).

[12]    *United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997).

evidence against a co-defendant is more damaging than the evidence against herself." (internal quotation marks omitted)). So Mrs. Yurek's complaints about the strength of the trial evidence against her husband do not warrant severance.

Coupled with the preference for joint trials is the district court's guidance to the jury. The court instructed the jury

- that it "must separately consider the evidence against each defendant and return a separate verdict for each" and

- that its "verdict as to one defendant . . . should not affect [its] verdict as to the other defendant."

R., vol. 2, at 113. These instructions, which the jury presumably followed, negated the risk of prejudice to Mrs. Yurek from the joint trial. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *Wardell*, 591 F.3d at 1301 (noting that the district court's jury instruction "to give separate and individual consideration to each charge against each defendant" and the district court's other cautionary statements to the jury "negated any risk of prejudice" to the defendant from the joint trial). We thus conclude that the district court acted within its discretion by denying Mrs. Yurek's motions to sever the trial and to grant a new trial.

17

**C.** **The district court's refusal to sever the trial did not violate Mrs. Yurek's right to confrontation because her husband's out-of-court statement had not been testimonial.**

Mrs. Yurek contends that the refusal to sever the trial violated her right to confrontation by allowing the government to use the husband's out-of-court statement against her. But the Sixth Amendment applies only when the out-of-court statement is testimonial.[13] *See United States v. Clark*, 717 F.3d 790, 815 (10th Cir. 2013) (observing that the Sixth Amendment's Confrontation Clause applies only if a statement is "testimonial"). Statements in furtherance of a conspiracy are nontestimonial, so they are admissible even when the defendants cannot confront the declarants. *United States v. Patterson*, 713 F.3d 1237, 1247 (10th Cir. 2013); *see Crawford v. Washington*, 541 U.S. 36, 56 (2004)

---

[13]     We have supplied "two possible definitions" for what constitutes a "testimonial" statement:

> 1.     "a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution" and
>
> 2.     "[a] formal statement [such that] a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime."

*United States v. Clark*, 717 F.3d 790, 816 (10th Cir. 2013) (alterations in original) (quoting *United States v. Smalls*, 605 F.3d 765, 778 (10th Cir. 2010)).

18

(observing that statements in furtherance of a conspiracy are not testimonial).

Prior to trial, the district court concluded that Mr. Yurek's out-of-court statement[14] was admissible against Mrs. Yurek as a statement by a coconspirator. To qualify for admissibility as a coconspirator statement, the statement must have been made during and in furtherance of a conspiracy. Fed. R. Evid. 801(d)(2)(E).

Mrs. Yurek does not challenge the district court's admissibility determination, so we regard the husband's out-of-court statement as nontestimonial. Introduction of this nontestimonial statement against Mrs. Yurek did not violate the Sixth Amendment. *See Patterson*, 713 F.3d at 1247 (concluding that statements made in furtherance of a conspiracy were properly admitted because they were nontestimonial).

### D. Mrs. Yurek has not demonstrated that her husband would have been willing to testify at a severed trial.

Mrs. Yurek also contends that if the trial had been severed, she could have cross-examined her husband about his out-of-court statement.[15] But Mrs. Yurek never presented evidence that her husband would have testified

---

[14] He made the statement in bankruptcy court; but for purposes of admissibility, the pertinent court is the federal district court in Mrs. Yurek's trial.

[15] The parties dispute whether Mrs. Yurek preserved this argument. For the sake of argument, we assume preservation.

at a severed trial. Indeed, Mrs. Yurek concedes that she does not know whether he would have done so. Appellant's Op. Br. at 27. The resulting uncertainty is fatal to Mrs. Yurek's contention. *See United States v. Pursley*, 577 F.3d 1204, 1216 (10th Cir. 2009) (upholding the denial of a motion to sever because the defendant did not submit affidavits from his co-defendants regarding their willingness to testify at a severed trial); *United States v. Dirden,* 38 F.3d 1131, 1141 n.13 (10th Cir. 1994) (upholding the denial of the defendant's motion to sever based on the lack of evidence that the co-defendant would have given exculpatory testimony).

* * *

For these reasons, we conclude that the district court acted within its discretion in denying Mrs. Yurek's motions for severance and a new trial.

## III. We reject Mrs. Yurek's challenge based on multiplicity.

Mrs. Yurek insists that she was convicted of multiplicitous charges: tax evasion and bankruptcy fraud. Charges are multiplicitous when they cover the same criminal conduct. *United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006). On challenges involving multiplicity, we generally engage in de novo review. *United States v. McIntosh*, 124 F.3d 1330, 1336 (10th Cir. 1997). But Mrs. Yurek did not raise the issue in a

20

pretrial motion, so we review her argument only for plain error. *Id.* We conclude that there was no error, plain or otherwise.

The Fifth Amendment forbids convictions on multiplicitous charges. *McCullough*, 457 F.3d at 1162. But under the *Blockburger* test, the same conduct can trigger prosecution for multiple crimes "if each crime requires proof of a fact that the other does not." *United States v. Berres*, 777 F.3d 1083, 1090 (10th Cir. 2015); *see Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). We thus focus on whether the elements differ for Mrs. Yurek's crimes of tax evasion and bankruptcy fraud. *See Illinois v. Vitale*, 447 U.S. 410, 416 (1980) (analyzing the elements of the crimes of conviction when applying the *Blockburger* test).

A conviction for tax evasion requires proof of three elements:

1. The defendant owed a substantial tax to the IRS.

2. The defendant committed "an affirmative act constituting an evasion or attempted evasion" of assessment or payment of the tax.

3. The defendant willfully evaded or attempted to evade the assessment or payment of the tax.

21

*United States v. Boisseau*, 841 F.3d 1122, 1125 (10th Cir. 2016) (citing *Sansone v. United States*, 380 U.S. 343, 351 (1965)). A conviction for bankruptcy fraud also requires proof of three elements:

1. The defendant devised or intended to devise a scheme to defraud or otherwise engage in a fraudulent scheme.

2. For the purpose of executing or concealing the scheme or attempting to do so, the defendant filed a petition under the Bankruptcy Code.

3. The defendant acted with the specific intent to defraud.

*United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011). As Mrs. Yurek admits, each crime requires proof of an element that the other crime does not. We thus would not ordinarily consider the two counts multiplicitous.

But Mrs. Yurek argues that the government's theory essentially required the same elements for both crimes because the government characterized the bankruptcy fraud as a scheme to evade taxes. To support this argument, Mrs. Yurek points to the indictment, contending that the indictment shows that both counts stemmed from the same underlying conduct. But the *Blockburger* test "focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." *Illinois v Vitale*, 447 U.S. 410, 416 (1980). Given the focus of this test, Mrs. Yurek's argument fails because the nature of the charges does not alter the elements that the government needed to prove.

22

To argue that she was convicted of multiplicitous charges, Mrs. Yurek also relies on *United States v. McIntosh*, 124 F.3d 1330 (10th Cir. 1997). In *McIntosh* we acknowledged that "Congress undoubtedly may subject a defendant to multiple convictions and punishments for the same act," but we held that Congress did not intend to subject the defendant to convictions for both 18 U.S.C. § 152(3) (making a false statement) and 18 U.S.C. § 152(7) (concealing assets). 124 F.3d at 1336–37.

But Mrs. Yurek was not convicted of violating either § 152(3) or § 152(7), so *McIntosh* does not control. And unless Congress expresses a contrary intent, "we presume . . . that Congress intended multiple convictions and sentences for the same criminal behavior which violates more than one statute when each statute requires proof of a fact that the other does not." *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013).

Mrs. Yurek has not pointed to any evidence that Congress expressed an intent to preclude a conviction for both tax evasion and bankruptcy fraud. Mrs. Yurek's reliance on *McIntosh* is thus misguided, and we conclude that the charges were not multiplicitous.

## IV. The district court erroneously calculated the guideline range by applying the wrong test for a mitigating-role adjustment.

Mrs. Yurek contends that the district court

- should have applied Sentencing Guideline § 2T1.1 to her conviction for bankruptcy fraud,

- incorrectly calculated the loss attributable to her, and

23

- applied the wrong test for a mitigating-role adjustment.

We agree that the district court erred in deciding whether to grant Mrs. Yurek a mitigating-role adjustment. But the court did not otherwise err at sentencing.

## A. Sentencing Guideline § 2T1.1 does not apply to Mrs. Yurek's conviction for bankruptcy fraud.

To calculate the guideline range, the district court must select the applicable guideline (if one exists) for the offense of conviction. U.S.S.G. 1B1.2(a) (2016).[16] Here the parties agree that the relevant offense of conviction was bankruptcy fraud under 18 U.S.C. § 157(1). For this offense, however, the Sentencing Commission has not expressly adopted a guideline. When the Sentencing Commission has not specified the applicable guideline, the district court must "apply the most analogous offense guideline." U.S.S.G. § 2X5.1 (2016). This process involves two steps. The court begins by determining which guidelines are sufficiently analogous; from these guidelines, the court then selects the most analogous

---

[16] The 2016 version was in effect at the time of Mrs. Yurek's sentencing. *See* U.S.S.G. § 1B1.11(a) (2016) (Ordinarily, "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

24

one.[17] *Id.* § 2X5.1 cmt.; *United States v. Nichols*, 169 F.3d 1255, 1270–71 (10th Cir. 1999).

The district court assumed for the sake of argument that both § 2T1.1 and § 2B1.1 were "sufficiently analogous" to bankruptcy fraud under 18 U.S.C. § 157(1). The district court then concluded that § 2B1.1 was the more analogous guideline.

The parties agree that § 2B1.1 is sufficiently analogous to bankruptcy fraud under 18 U.S.C. § 157(1).[18] But the parties disagree over whether § 2T1.1 is also sufficiently analogous to bankruptcy fraud. To determine whether § 2T1.1 is "sufficiently analogous" to bankruptcy fraud, we compare the elements of bankruptcy fraud under 18 U.S.C. § 157(1)

---

[17] If there is not a sufficiently analogous guideline, 18 U.S.C. § 3553 would control. U.S.S.G. § 2X5.1 cmt. (2016).

[18] Section 2B1.1 covers crimes of fraud and deceit. Two of the crimes covered by § 2B1.1 are mail fraud and wire fraud. *See* U.S.S.G. App'x A (2016) (identifying 18 U.S.C. §§ 1341 and 1343 as covered by § 2B1.1). The statutes for these crimes served as the model for § 157. *See United States v. Milwitt*, 475 F.3d 1150, 1155 (9th Cir. 2007). Like § 157, both mail fraud and wire fraud include as elements (1) a scheme or artifice to defraud and (2) the specific intent to defraud. *Compare United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011) (listing the elements for bankruptcy fraud under § 157(1)), *with United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) (listing the elements for mail fraud and wire fraud).

25

with the elements of the offenses covered by § 2T1.1. *See United States v. Nichols*, 169 F.3d 1255, 1270 (10th Cir. 1999).[19]

Section 2T1.1 relates to matters of taxation. Thus, all of the crimes expressly covered by § 2T1.1 involve taxation:

- evading taxes (26 U.S.C. § 7201),

- willfully failing to file a tax return, keep records, supply information, or pay a tax (26 U.S.C. § 7203),

- making false or fraudulent statements to the IRS (26 U.S.C. § 7206(1), (3), (4), and (5)),

- willfully filing a fraudulent return, statement, or other document (26 U.S.C. § 7207),

- making false statements to purchasers or lessees relating to a tax (26 U.S.C. § 7211), and

- attempting to interfere with the administration of the tax laws (26 U.S.C. § 7212(a)).

U.S.S.G. App'x A (2016).

Because these crimes target taxation, they contrast starkly with bankruptcy fraud. Bankruptcy fraud requires specific intent to defraud,[20] and the § 2T1.1 crimes require specific intent only with regard to the tax laws. For example, tax evasion under 26 U.S.C. § 7201 requires proof that

---

[19]    Because the district court didn't decide this issue, we use our independent judgment on this legal issue. *Cf. Nichols*, 169 F.3d at 1270 (stating that determination of the first step is "purely legal," requiring de novo review).

[20]    *United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011).

a defendant had the "specific intent to evade taxes." *United States v. Payne*, 978 F.2d 1177, 1182 (10th Cir. 1992). A violation of 26 U.S.C. § 7203 occurs only if a defendant "willfully fails" to pay a tax, file a return, keep tax records, or supply tax-related information. And a conviction under 26 U.S.C. § 7206(4) requires the government to prove that a defendant hid taxable property "with intent to evade or defeat the assessment or collection" of a tax. So the specific-intent element for bankruptcy fraud sweeps beyond the specific-intent elements found in § 2T1.1 crimes.

Nor is there a match between § 2T1.1 and bankruptcy fraud's first element (scheme to defraud). *See United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011). It is true that many of the crimes covered by § 2T1.1 target fraudulent conduct. But § 2T1.1's fraud crimes again relate only to the tax laws:

1.  making false or fraudulent statements to the IRS (26 U.S.C. § 7206(1)),

2.  making false statements regarding a tax to purchasers or lessees (26 U.S.C. § 7211),

3.  filing false or fraudulent documents with the IRS (26 U.S.C. § 7207),

4.  concealing taxable property from the IRS (26 U.S.C. §§ 7206(4) and 7206(5)), and

5.  falsely or fraudulently executing or signing documents required by the provisions of the Internal Revenue Code or regulations issued under those provisions (26 U.S.C. § 7206(3)).

27

*See* p. 26, above. Unlike these crimes, bankruptcy fraud targets a scheme to defraud unrelated to taxation or the administration of the federal tax laws. So the fraudulent conducted covered by bankruptcy fraud sweeps beyond the fraudulent conduct covered by § 2T1.1.

Because the elements of § 2T1.1 crimes are narrower than and largely unrelated to the elements of bankruptcy fraud, we conclude that § 2T1.1 is not sufficiently analogous to bankruptcy fraud. Thus the only potentially applicable guideline was § 2B1.1, and the district court did not err by applying this section.

### B. The amount of intended loss attributable to Mrs. Yurek could reasonably be based on the amount of debt that Mrs. Yurek had tried to discharge in bankruptcy.

At Mrs. Yurek's sentencing, the district court applied Sentencing Guideline § 2B1.1 to determine Mrs. Yurek's base-offense level and specific offense characteristics. For the specific offense characteristics, § 2B1.1 allowed the court to increase the base-offense level based on the

amount of the intended loss attributable to a defendant.[21] *See* U.S.S.G. § 2B1.1(b)(1) (2016).

To calculate the intended loss, the district court considered two methodologies:

1. the amount of federal tax debt that Mrs. Yurek tried to discharge in bankruptcy and

2. the value of the assets that Mrs. Yurek concealed from the bankruptcy court.

The court found that under either approach, the intended loss was between $550,000 and $1,500,000. Given this finding, the court overruled Mrs. Yurek's objection to the U.S. Probation Department's recommendation of a 14-level enhancement.

On appeal, Mrs. Yurek argues that the loss attributable to her was less than $550,000 and that the district court erred in two ways when calculating the intended loss:

1. The amount sought to be discharged in bankruptcy did not constitute an appropriate methodology.

2. The district court miscalculated the value of the assets that had been concealed from the bankruptcy court.

We reject Mrs. Yurek's challenge to the district court's methodology for calculating the intended loss. Determining this methodology involves a

---

[21] Under § 2B1.1, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A) (2016). The parties agree that the applicable measure of loss is intended loss because there was no actual loss.

legal conclusion, so we engage in de novo review. *See United States v. Gordon*, 710 F.3d 1124, 1160–61 (10th Cir. 2013) (stating that we engage in de novo review of the district court's methodology for calculating loss under § 2B1.1(b)). Engaging in de novo review, we start with the applicable guideline and related application notes. The application notes for § 2B1.1 define "intended loss" as a loss that a defendant "purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii)(I) (2016); *see United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (Gorsuch, J.) ("Something is intended if it is done on purpose—not merely known, foreseen, or just possible or potentially contemplated.").[22] We must follow this definition of intended loss because it is not plainly erroneous, inconsistent with § 2B1.1, or violative of the U.S. Constitution or a federal statute. *United States v. Mojica*, 214 F.3d 1169, 1171 (10th Cir. 2000).

Applying this definition, we conclude that the intended loss equals the monetary harm that Mrs. Yurek wanted to cause her creditors. *See United States v. Holthaus*, 486 F.3d 451, 455 (8th Cir. 2007) ("When determining intended loss [in the bankruptcy context], we look to the

---

[22]    In *Manatau*, we interpreted the phrase "intended loss" in a prior version of § 2B1.1 to mean "a loss the defendant *purposely* sought to inflict." *Manatau*, 647 F.3d at 1050 (emphasis in original). The Sentencing Commission later amended § 2B1.1 to reflect this holding. *See* U.S.S.G. amend. 792 (eff. Nov. 1, 2015), *available at* U.S.S.G. supp. to app. C 108–12 (2016).

amount of loss a defendant actually intended to cause his creditors.”); *United States v. Bussell*, 504 F.3d 956, 962 (9th Cir. 2007) (“When determining intended loss [in the bankruptcy context], we must look to the amount of loss that [the defendant] intended to cause her creditors.”).

These creditors included the IRS, so the intended loss includes the amount of federal tax debt that Mrs. Yurek tried to discharge in bankruptcy. That discharge would have extinguished Mrs. Yurek’s federal tax debt, causing a loss to the IRS. *See United States v. Mutuc*, 349 F.3d 930, 937 (7th Cir. 2003) (“A successful discharge in bankruptcy would have left the creditors without recourse against Mutuc; it follows that Mutuc intended a loss equal to the amount to be discharged in bankruptcy.”).

In similar circumstances, other circuits have ordinarily allowed calculation of the intended loss based on the amount of debt that the defendant was trying to discharge, though the circuits have taken somewhat different approaches. For example, the Seventh Circuit has flatly stated that it allows measurement of the intended loss based on the amount that the defendant sought to discharge in bankruptcy. *See United States v. Arthur*, 582 F.3d 713, 720–21 (7th Cir. 2009); *United States v. Mutuc*, 349 F.3d 930, 936–37 (7th Cir. 2003); *United States v. Holland*, 160 F.3d 377, 381 (7th Cir. 1998). On the other hand, the Ninth Circuit allows the district court to consider the economic realities in each case and use discretion in

31

determining whether to calculate the intended loss based on the entire amount to be discharged or the value of concealed assets. *See United States v. Bussell*, 504 F.3d 956, 961–62 (9th Cir. 2007). And the Eighth Circuit has suggested that the intended loss can equal the entire amount that the defendants are trying to discharge only if the fraud had created the illusion of dischargeability. *See United States v. Holthaus*, 486 F.3d 451, 455 (8th Cir. 2007).

All of these approaches support the district court's decision to calculate the intended loss attributable to Mrs. Yurek based on the amount of tax debt ($1.2 million) that Mrs. Yurek was trying to discharge in bankruptcy. So regardless of whether we consider the economic realities or the illusion of dischargeability, the district court did not err in calculating the intended loss based on the amount that Mrs. Yurek had tried to discharge in bankruptcy.

Of course, Mrs. Yurek couldn't succeed in causing this loss because once she committed tax evasion, the entire tax debt became nondischargeable. *See* 18 U.S.C. § 523(a)(1)(C). But a loss can be intended even when it is improbable or impossible. U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) (2016).[23]

---

[23] We have stated that a loss is intended only if (1) "the defendant realistically intended a particular loss" or (2) such a loss was probable. *United States v. Swanson*, 360 F.3d 1155, 1168 (10th Cir. 2004); *United*

Mrs. Yurek disagrees, relying on *United States v. Holthaus*, 486 F.3d 451 (8th Cir. 2002). There, however, the Eighth Circuit expressly disavowed a blanket prohibition against calculation of intended loss based on the amount that the defendant had tried to discharge in bankruptcy. *Holthaus*, 486 F.3d at 455; *see* p. 32, above. Given the pinpoint citation in Mrs. Yurek's opening appeal brief, Mrs. Yurek is apparently intending to rely on the *Holthaus* panel's discussion of a prior opinion, *United States v. Wheeldon*, 313 F.3d 1070 (8th Cir. 2002). There the Eighth Circuit addressed the proper method for calculating intended loss when the amount of the attempted discharge exceeds the value of the concealed assets. *Wheeldon*, 313 F.3d at 1072. Applying the 2000 version of the U.S. Sentencing Guidelines, the Eighth Circuit concluded that this situation required the district court to calculate the intended loss based on the value of the concealed assets. *Id.*

In reaching this conclusion, the Eighth Circuit didn't apply the term "intended loss;" the court instead applied the term "probable intended

---

*States v. Schild*, 269 F.3d 1198, 1200 (10th Cir. 2001). We later characterized the reference to "probable" loss as "dicta" based on "questionable authority." *United States v. Baum*, 555 F.3d 1129, 1134 (10th Cir. 2009). That "questionable authority" was *United States v. Smith*, 951 F.2d 1164 (10th Cir. 1991), which had relied on guideline language that was later deleted. *See Baum*, 555 F.3d at 1134–35 (discussing the origin of the language in *Swanson* and *Schild* and later changes to the sentencing guidelines).

loss." *Id.* But the Sentencing Commission amended the applicable definition of "intended loss" in 2001, providing that a loss can be intended even when it is unlikely or impossible. U.S.S.G. amend. 617 (eff. Nov. 1, 2001), *available at* U.S.S.G. app. C vol. II at 117 (2016) ("The amendment resolves the conflict to provide that intended loss includes unlikely or impossible losses that are intended, because their inclusion better reflects the culpability of the offender."); *see* p. 32 & note 23, above. Given the change in definition, the nondischargeability of Mrs. Yurek's tax debt does not affect the available methods to calculate intended loss.

Mrs. Yurek listed a tax debt of $1.2 million in her bankruptcy petition, requesting that it be discharged. And her husband, who also signed the bankruptcy petition, stated in bankruptcy court that he and his wife had filed the bankruptcy petition in order to discharge their $1.2 million tax debt. Given this evidence, the court could calculate the intended loss attributable to Mrs. Yurek based on the amount of tax debt that she had tried to discharge.

\* \* \*

We conclude that the district court appropriately calculated the intended loss attributable to Mrs. Yurek based on the amount of tax debt that she had tried to discharge in bankruptcy. Thus, the district court did not err in applying the 14-level sentencing enhancement.

**C. The district court plainly erred by applying the wrong test for a mitigating-role adjustment.**

Mrs. Yurek also argues that the district court applied the wrong test when deciding not to grant a downward adjustment for a mitigating role. We agree.

**1. Preservation and the Argument for Plain Error**

The government contends that Mrs. Yurek did not preserve the issue for appeal. We agree.

To preserve an appellate issue involving the district court's explanation for a sentence, the defendant must lodge a "contemporaneous objection." *United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007); *see United States v. Lopez-Flores*, 444 F.3d 1218, 1221 (10th Cir. 2006) ("[T]he usual reasons for requiring a contemporaneous objection apply to challenges to the district court's method of arriving at a sentence."). At sentencing, the district court explained that it would deny Mrs. Yurek a mitigating-role adjustment because her participation in tax evasion and bankruptcy fraud had been "central and necessary for both . . . crimes to take place." R., vol. 5, at 1925; *see also id.* at 1925–26 (finding "ample grounds to conclude that Ms. Yurek's participation in these criminal schemes was central and necessary and that her husband could not have proceeded with either the tax evasion or the bankruptcy fraud without her").

35

Mrs. Yurek argues that the district court applied the wrong test. She bases her argument on the district court's explanation for denying a mitigating-role adjustment, but she did not raise this issue in district court. According to Mrs. Yurek, she preserved the issue by objecting to the presentence report. But she is alleging an error in the district court's explanation, not in the content of the presentence report. So objecting to the presentence report would not have alerted the district court to an error in its explanation. *See United States v. Mendoza*, 543 F.3d 1186, 1195 (10th Cir. 2008);[24] *see also United States v. Chavez-Morales*, 894 F.3d 1206, 1213 (10th Cir. 2018) (concluding that a defendant's sentencing memorandum did not preserve an issue involving the adequacy of the district court's explanation). Because Mrs. Yurek did not preserve her argument involving correctness of the legal standard for a mitigating-role

---

[24] In *Mendoza*, the government appealed the sentence, arguing that the district court failed to provide written reasons for its downward variance. 543 F.3d at 1186. We concluded that the government had forfeited this appeal point by failing to alert the district court to its failure to provide written reasons. *Id.* at 1195. An objection to the presentence report didn't suffice for preservation: "Unlike other forms of sentencing error, which can be preserved for appellate review through written objections to the [presentence report] or an oral objection during the sentencing hearing, failure to enter a written statement of reasons becomes apparent to the parties only after the court enters its final judgment regarding the sentence imposed." *Id.*

adjustment, any review would be confined to the plain-error standard. *Romero*, 491 F.3d at 1178.[25]

But the government argues that Mrs. Yurek lost her opportunity to urge plain error by waiting until her reply brief to do so. We disagree. Mrs. Yurek appeared to assume in her opening brief that she had preserved her challenge to the denial of a mitigating-role adjustment. After the government challenged preservation, Mrs. Yurek argued in her reply brief that the error would be considered plain even if she had forfeited the issue. This approach was a permissible way to invoke plain-error review. *See United States v. Zander*, 794 F.3d 1220, 1232 n.5 (10th Cir. 2015) ("We hold that Defendant adequately addressed the issue of plain error review in his reply to the government's brief, after arguing in his opening brief that his objections below were sufficiently raised to be preserved for review on appeal."). We thus apply the standard for plain error.

### 2. Mrs. Yurek is entitled to relief under the plain-error standard.

For Mrs. Yurek to prevail under the plain-error test, she must show

1. that an error took place,

---

[25] Mrs. Yurek contends that the government induced the error by arguing that she had played a central and necessary role in the crimes. But the government never suggested to the district court that it apply the wrong legal test. The government simply argued against a mitigating-role adjustment. Presentation of this argument did not induce the court's error.

2. that the error was plain,

3. that it affected her substantive rights, and

4. that the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."

*United States v. Bustamante-Conchas*, 850 F.3d 1130, 1137 (10th Cir. 2017) (en banc). Mrs. Yurek has satisfied each of these prongs.

### a. The government properly conceded the first and second prongs.

The government concedes the first two prongs of the plain-error test. We agree that the first two prongs are satisfied.

A defendant who was a minimal or minor participant in criminal activity is eligible for a downward adjustment. *See* U.S.S.G. § 3B1.2 (2016). Finding that a defendant performed an "essential or indispensable role . . . is not determinative" of eligibility for this adjustment. *Id.* § 3B1.2 cmt. n.3(C). The court instead must focus on whether the defendant "is substantially less culpable than the average participant in the criminal activity." *Id.*; *see United States v. Salazar-Samaniega*, 361 F.3d 1271, 1277 (10th Cir. 2004) (noting that a § 3B1.2 reduction is available only for "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant"); *United States v. Ayers*, 84 F.3d 382, 383 (10th Cir. 1996) ("Section 3B1.2 vests the district court with discretion to grant a base-offense level reduction if it finds a

defendant is less culpable relative to other participants in a given offense." (internal quotation marks omitted)).

But the district court did not consider Mrs. Yurek's culpability relative to other participants in the scheme.[26] The court instead found that Mrs. Yurek's role had been essential to the crimes and treated that finding as determinative. By failing to consider Mrs. Yurek's relative culpability, the district court applied the wrong test when denying a mitigating-role adjustment. As the government admits, the district court's application of the wrong test constitutes an error that was plain. Mrs. Yurek has thus satisfied both the first and second prongs of the plain-error standard.

---

[26] In the criminal scheme, only two persons were named: Mrs. Yurek and her husband. But the husband was not an "average participant" because he had obtained a two-level enhancement for a leadership role in the crimes. So in this scheme, it is impossible to compare Mrs. Yurek's culpability to another "average" participant.

Given the absence of another "average" participant in this scheme, the sentencing court must focus on (1) the degree of Mrs. Yurek's culpability relative to her husband's and (2) the scope of the criminal scheme. *See United States v. Lopez*, 545 F.3d 515, 517 (7th Cir. 2008) ("[I]n situations where criminal activity involves only two participants (and thus it is impossible to ascertain the culpability of an 'average' participant), the key inquiry is the degree of the defendant's culpability relative to the other participant's and the scope of the criminal enterprise."). With this dual focus, the court should determine whether Mrs. Yurek bore substantially less culpability than her husband. *See id.*; *see also United States v. Tholl*, 895 F.2d 178, 1185–86 (7th Cir. 1990) (concluding that under § 3B1.2, it was not enough for the defendant to prove less culpability than the sole other participant, who had been the "mastermind" behind the criminal scheme).

### b. Mrs. Yurek has satisfied the third prong of the plain-error test.

Mrs. Yurek has also satisfied the third prong of the plain-error test. Under this prong, Mrs. Yurek bears the burden to show prejudice. *United States v. Gonzales-Huerta*, 403 F.3d 727, 732–33 (10th Cir. 2005). To satisfy this burden, Mrs. Yurek must show a reasonable probability sufficient to undermine confidence in the outcome at her sentencing. *United States v Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc). Confidence in the outcome can be undermined even if Mrs. Yurek's showing would not satisfy the preponderance-of-the-evidence standard. *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004).

Mrs. Yurek has shown prejudice from the district court's application of the wrong test. The crux of § 3B1.2 is a defendant's relative culpability. *See* pp. 38–39, above. After denying a mitigating-role adjustment to Mrs. Yurek, the court considered her relative culpability and downplayed her role in the scheme:

> It is true that the trial evidence established that the defendants used accountants and attorneys as tools to accomplish the bankruptcy fraud and tax evasion schemes for which they were convicted, but in the mitigation for this defendant, these accountants and attorneys unambiguously testified at trial that *it was always Mr. Yurek, as opposed to his wife, who took the lead in communicating and strategizing with them in the perpetuation of these schemes*.
>
> While it does not absolve her from her culpability for her crimes, *in my judgment fairness requires me to temper the sentence I will impose on Ms. Yurek to reflect her passive and,*

40

*to some degree, submissive personality when compared to her husband*, at least insofar as matters such as the complex criminal schemes in this case are concerned.

R., vol. 5, at 1969–70 (emphasis added). Given Mrs. Yurek's lesser role in the scheme, the district court varied downward to 27 months from the guideline range of 41–51 months.

The district court justified the downward variance based in part on its view that Mrs. Yurek bore less culpability than her husband. If a district court finds that a defendant is less culpable relative to other participants in a crime and varies downward from the advisory guideline range based partly on that determination, a reasonable probability exists that the district court would have granted a mitigating-role adjustment under the correct test. *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 820 (10th Cir. 2005) (considering a district court's comments at sentencing when determining whether the plain error prejudiced the defendant); *see also United States v. Sierra-Castillo*, 405 F.3d 932, 942 (10th Cir. 2005) (noting that a district court's comments at sentencing can help a defendant satisfy the third prong of the plain-error test).

And if the district court had granted Mrs. Yurek a mitigating-role adjustment, the district court's starting point (the guideline range) would have been lower. "When the court's starting point is skewed a 'reasonable probability' exists that its final sentence is skewed too." *United States v.*

41

*Sabillon-Umana*, 772 F.3d 1328, 1333 (10th Cir. 2014) (Gorsuch, J.). Mrs. Yurek has thus satisfied the third prong of the plain-error test.

### c.     The fourth prong was also satisfied.

To satisfy the fourth prong, Mrs. Yurek must show that the district court's error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1137 (10th Cir. 2017) (en banc). We conclude that Mrs. Yurek has met this burden.

When an error affects the calculation of a defendant's guideline range, the fourth prong is ordinarily satisfied when the first three prongs are satisfied. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). After all, "what reasonable citizen wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?" *Id.* (quoting *United States v. Sabillon-Umana*, 772 F.3d 1328, 1333–34 (10th Cir. 2014) (Gorsuch, J.)).

* * *

We conclude that the district court plainly erred by applying the wrong test for a mitigating-role adjustment.

42

**V.    Conclusion**

We affirm Ms. Yurek's conviction, but we vacate her sentence and remand for resentencing. At resentencing, the district court must reconsider the possibility of a mitigating-role adjustment.